IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CHRISTOPHER GOODVINE,

OPINION
and ORDER

Plaintiff,

06-C-491-bbc

v.

GREG GRAMS, JANEL NICKEL, CAPTAIN JOHNSON,
CAPT. S. SALTER, CAPT. TRATTLES, LIEUTENANT
KELLER, LT. SCHOENBERG, MATTHEW J. FRANK,
BURT TAMMINGA, MS. SITZMAN, LT. STRUPP,
MS. HAHNISCH, MS. WARD, MS. MUCHOW,
T. BITTLEMAN, CYNTHIA THORPE and DR. SULIENE,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In this case, plaintiff has been allowed to proceed on Eighth Amendment claims against defendants Thomas Bittelman, Greg Grams, Capt. Trattles, Lt. Keller, Capt. Mark Johnson. Lt. Todd Strupp, Lt. Thomas Schoenberg, Capt. S. Salter, Burt Tamminga, Sandra Sitzman, Cynthia Thorpe, Matthew J. Frank, Nancy Hahnisch, Lindy Muchow, Suzanne Ward and Dalia Suliene and on a First Amendment retaliation claim against defendants Janel Nickel, Salter and Bittelman.  Plaintiff's Eighth Amendment claims concern the

1

physical conditions of two different cells in which he was confined at the Columbia Correctional Institution in early 2006 and the alleged denial of medical treatment. His First Amendment claim concerns an alleged retaliatory transfer to the Waupun Correctional Institution on February 23, 2006. The case is presently before the court on defendants' motion for summary judgment.

Because plaintiff concedes that he did not exhaust his administrative remedies with respect to his First Amendment retaliation claim, I will dismiss that claim without prejudice to plaintiff's refiling the claim at a later time. Because the unexhausted claim is the only claim plaintiff lodged against defendant Janel Nickel, she will be dismissed from the case.

Defendants' motion for summary judgment will be granted with respect to plaintiff's claims that the conditions of cell #27 violated his Eighth Amendment rights and that certain defendants were deliberately indifferent to his serious medical needs, because plaintiff has failed to put in evidence to sustain his burden of proof at trial that the conditions of cell #27 were objectively serious or that any defendant ignored his requests for medical care. Defendants' motion for summary judgment will be granted with respect to plaintiff's claims that defendants Keller, Trattles and Grams were deliberately indifferent to the conditions in cell #46, because plaintiff has failed to carry his burden of providing evidence to show that these defendants were aware of the conditions. Defendants' motion will be denied with respect to plaintiff's claims that defendants T. Bittleman, Lt. Schoenberg, Lt. Strupp and

2

Captain Johnson turned a blind eye to the conditions in cell #27, because there are material facts in dispute as to what these defendants saw and whether, if they saw conditions sufficiently serious to violate the Eighth Amendment, they were aware that they were exposing plaintiff to a serious risk of harm and ignored that risk. These questions remain for resolution at trial.

Before I set out the parties' undisputed facts, a word about the facts is required. Plaintiff has filed a "Motion to Disregard Defendants' Response to Plaintiff's Proposed Findings of Fact" (Dkt. #88), in which he argues that I should ignore defendants' response to his proposed findings of fact because the response does not comply with this court's summary judgment procedures. In addition, he has filed a "Motion to Supplement Affidavits One and Two of Plaintiff's Opposition Materials" to permit him to attest to the authenticity of exhibits attached to his affidavits (Dkt. #82). Both motions will be denied as unnecessary.

In a scheduling order dated October 3, 2006, Judge Shabaz set a deadline for the filing of dispositive motions and directed the parties' attention to the court's <u>Procedure to be Followed on Motions for Summary Judgment in Cases Involving Pro Se Litigants</u>, a copy of which was attached to the order. In those procedures, the parties were cautioned expressly at Procedure IV that the court would ignore factual propositions that were not supported by references to evidence in the record and that the court would not search the

3

record for factual matters supporting either the granting or denial of the motion.  Thus, to the extent that either party has failed to comply with those procedures, or has cited evidence that fails to support a fact proposed, I have ignored those particular factual propositions.

Regarding plaintiff's motion to file supplements to his affidavits, the vast majority of his exhibits related to undisputed or immaterial facts.  In the rare circumstance in which plaintiff referred to an exhibit to support his version of a fact that differed from defendants' version, the exhibit either did not support the proposed fact or was one that I accepted for consideration because the document appeared to have been supplied to plaintiff in response to discovery demands or was a document that plaintiff authored and, therefore, could authenticate himself.

From the parties' proposed findings of fact, I find the following facts to be material and undisputed.

## FACTS

At all relevant times, plaintiff Christopher Goodvine was an adult inmate incarcerated at the Columbia Correctional Institution in Portage, Wisconsin.

Defendants Greg Grams, Travis Bittleman, Thomas Schoenberg, Mark Johnson, Todd Strupp, Burt Tamminga, Capt. Salter, Capt. Trattles, Lt. Keller, Sandra Sitzman, Nancy Hahnisch, Lindy Muchow, Suzanne Ward and Dalia Suliene were employees at the

4

Columbia Correctional Institution.  Defendant  Grams was the warden.  Defendant Bittelman was a correctional officer.  Defendants Keller, Schoenberg and Strupp were Supervising Officers I (Lieutenants).  Defendants Johnson, Trattles and Salter were Supervising Officers 2 (Captains).  Defendant Tamminga was a corrections complaint examiner.  Defendant Suliene was a physician.  Defendant Sitzman was a Nursing Supervisor and defendants Hahnisch, Muchow and Ward were registered nurses.

Defendant Cynthia Thorpe is employed by the Wisconsin Department of Corrections as Health Services Nursing Coordinator.  She is responsible for coordination and oversight of health services provided at adult and juvenile facilities in the department.  She does not supervise the day-to-day operations of individual correctional institutions.

At all relevant times, defendant Matthew Frank was the Secretary of the Wisconsin Department of Corrections.

## A.  Cell #46

On January 9, 2006, at about 7:00 p.m., defendant Bittelman and another officer placed plaintiff in cell #46, a controlled segregation cell in the DS-1 unit of the institution. Plaintiff remained in that cell dressed only in his underwear until about 1:00 a.m. on January 11, 2006.

It is institution policy to allow inmates in controlled segregation to wear underwear

5

only and possess a black rubber mat on which to sleep.  Also, it is institution policy to restrict access to toilet water in controlled segregation cells.  If an inmate wants to flush the toilet, the inmate must ask that the toilet water be turned on.  (The parties dispute whether water from the sink is regulated in the same way.)  Drinking fluids are provided to inmates in controlled segregation with each meal.

It is institution policy to clean a cell before a different inmate is placed in it.  Nevertheless, upon entering cell #46, plaintiff noticed and complained to defendant Bittleman about mounds of human waste and puddles of urine in the cell.  Plaintiff also saw pubic hair and semen all over the cell.  He asked Bittleman whether he had cleaned the cell and Bittleman replied, "No, that's not my job."  (The parties dispute whether Bittleman saw what plaintiff saw in cell #46.)

Defendants Trattles and Grams were both on the DS-1 unit at the time.  Plaintiff yelled about the filth as they were leaving the unit.  Grams looked back toward plaintiff's cell.

Later on January 9, 2006, sometime around 11:00 p.m., plaintiff spoke to defendant Johnson and pointed out to him visible human waste.  In addition, plaintiff told Johnson he was extremely cold.  Johnson informed plaintiff that there were no other cells available on the unit and that plaintiff had been given the property he was allowed to have in controlled segregation status pursuant to institution policy.

6

On January 10, 2006, plaintiff stopped defendant Strupp as he was walking by plaintiff's cell.  Plaintiff complained to Strupp about the feces, urine, semen and pubic hair in the cell and told him he was extremely cold.  Also, sometime while plaintiff was in cell #46, defendant Schoenberg passed by.  Plaintiff showed Schoenberg his cell and complained that it was dirty, but did not state that it was covered in human waste.  He complained also that he was extremely cold and asked for some clothing or bedding, but was refused both.

The conditions of cell #46 made plaintiff physically sick.

Well after plaintiff had been moved out of cell #46, on January 17, 2006 and again on January 18, 2006, plaintiff wrote letters to defendant Grams complaining about the conditions of the cell and the fact that he had been stripped of all his belongings except his underwear and made to sleep on a rubber mat.  Grams does not investigate inmate complaints himself.  Instead, because of the serious issues plaintiff raised about sanitation and cleanliness, he referred plaintiff's letters to defendant Salter for review and follow-up.


B.  Cell #27

Plaintiff has a history of asthma.  It is induced by dust or when he exercises.  He has been prescribed an inhaler to use "as needed."

On January 11, 2006, at around 1:00 a.m., a Lieutenant Berkebill and defendant Johnson moved plaintiff to cell #27, because plaintiff's status had changed from controlled

7

segregation to segregation.  Plaintiff remained confined there until February 24, 2006.  Cell #27 had been occupied earlier by inmate Manuel Williams,  who had been extracted from the cell on January 10, 2006 with the use of the chemical spray Oleoresin Capsicum.  An inmate janitor cleaned the cell after the extraction, but did not use a power hose.  While plaintiff was assigned to cell #27, he had difficulty breathing, severe chest pain, dry, burning skin, headaches, minor asthma attacks and watery eyes.

On January 18, 2006, plaintiff wrote to Capt. Salter to express a number of concerns. With respect to the conditions in Cell #27 plaintiff wrote,

> Also - on 1/10/06 inmate Manuel Williams was forcibly removed from this cell in which I am currently housed.  Chemicals were used in extracting him from this cell (27 DS-A-lower).  Approx. 4-6 hours later I was placed in this cell. When I entered the cell there was a large amount of 'orangish looking' liquid on the back wall, some of which had dripped down to the floor and corner by my bed.  This chemical restraint (I assume mace - but not the kind in a tube - this as expelled from a canister) is present in this room and it is restricting my breathing, especially when I move around or sleep in my bed at night - which is directly next to this wall.  Staff have been informed and they refuse to come and take photos of the walls and clean them.  The presence of this chemical is also causing me nasal problems, my eyes are constantly irritated.  Please have staff come in and clean this material up.  I have cleaned most but am unable to remove a fairly large amount from the crevice between floor and wall and on back wall.  <u>Immediate help is requested</u>.
>
> Dated this day (18th) of Jan. 2006.
>
> Note: <u>You could at least have staff give me some towels and cleaning solutions so that I can remove and clean what I can</u>.

(Emphasis in original).

8

On January 19, around 1:00 p.m., plaintiff was evaluated by defendant Muchow in response to a health service request plaintiff had made. Plaintiff reported to her that he was experiencing headaches and had difficulty breathing, chest tightness and pain, although he denied shortness of breath at the time of the examination. Muchow listened to plaintiff's breathing and took his oxygen levels and temperature. Her assessment was that there was nothing abnormal about plaintiff's physical condition. Nevertheless, she scheduled plaintiff for an appointment with a doctor so that plaintiff could discuss his reported asthma symptoms with the doctor. Muchow also checked with the security staff regarding plaintiff's complaints about the chemical residue in his cell. The security staff confirmed what plaintiff had already told Muchow, that plaintiff was not on the tier when the chemicals were used. Staff also informed Muchow that following the use of chemicals, cell #27 had been ventilated and cleaned before plaintiff had been placed there. At this time, defendant Muchow believed that plaintiff's cell was sanitary and presented no danger to him.

Later on January 19, 2006, at around 9:00 p.m., plaintiff experienced chest pains and the inability to take a meaningful breath, which seemed to him to be a minor asthma attack. A Sgt. Fink called the Health Services Unit and defendant Ward responded to the call at about 9:45 p.m. When she arrived at plaintiff's cell door, plaintiff told her that OC spray had been used in his cell several days earlier and that he could still smell the odor. He complained of breathing problems, migraines and allergic reactions. Ward did not have

9

plaintiff removed from his cell to examine him.  Through the window of the cell door, she observed that plaintiff had no shortness of breath, no wheezing and no difficulty breathing (The parties dispute whether Ward also checked plaintiff's oxygen saturation and found it to be 99%.)  Plaintiff told defendant Ward that it was his allergy to peppers that was being upset by the OC spray and exacerbating his asthma.  She responded, "You'll get over it."

Ward followed up her visit with plaintiff by making inquiries of the unit officers, all of whom indicated the cell had been ventilated and scrubbed.  She spoke with the regular sergeant on plaintiff's unit, a Sergeant Hart, who told Ward that plaintiff had not complained of respiratory or other problems such as eye problems or nasal bleeding related to OC spray odor.  In addition, Ward reviewed the literature on OC spray and had a conversation with defendants Trattles and Strupp to gain further information about the chemical reaction of OC spray and its lingering effects.

Also on January 19, 2006, plaintiff sent defendant Grams a letter complaining that there was chemical residue in his cell and that health services staff had refused to treat him for his complaints of physical problems related to the residue.  In response, Grams sent a memo to plaintiff advising him that he was referring the matter to defendant Salter and defendant Sitzman in the health services unit.

Although Salter does not recall specifically when or how he learned of plaintiff's complaints from defendant Grams, Salter responded to the matter by talking to staff on

10

plaintiff's unit, who informed him that plaintiff's cell had been thoroughly cleaned.

On January 20, 2006, plaintiff sent defendant Grams two more letters renewing his complaints about health services staff failing to treat him for breathing problems.  Grams advised plaintiff in a memo dated January 23, 2006 that he was forwarding plaintiff's complaints to defendant Sitzman for priority review and feedback to his office.  In early February, Grams received a report from the health services unit advising him that plaintiff had shown no signs of difficulty breathing upon examination by three nurses on three different occasions.

Also on January 20, 2006, defendant Tamminga acknowledged receipt of two inmate complaints from plaintiff.  The complaints were assigned numbers CCI-2006-1846 and CCI-2006-1845.  In complaint CCI-2006-1846, plaintiff complained that he had been placed in a cell in which OC spray had been used on the prior occupant.  He complained as well that his cell had not been cleaned well enough and that residue from the spray remained on the walls.  He stated that the residue was causing him to have breathing problems and that nursing staff had been indifferent to his medical needs.  Complaint CCI-2006-1845 also concerned complaints about the OC spray stains on plaintiff's cell walls.  Therefore, defendant Tamminga rejected that complaint as duplicative of complaint CCI-2006-1846.

In response to plaintiff's complaint CCI-2006-1846, defendant Tamminga spoke with a Sgt. Delong, who confirmed that the cell had been cleaned and inspected before plaintiff

was placed in the cell.  Delong also indicated that he was common for the OC spray to stain the paint on a wall where it hits directly.  In addition, Tamminga contacted defendant Ward, who said that she and defendants Hahnisch and Muchow had seen plaintiff and that each had observed on separate occasions that plaintiff was not showing signs of difficulty breathing.  Ward also told Tamminga that she had contacted the unit officers, defendants Trattles and Strupp, who reported and confirmed that the cell had been ventilated, cleaned and scrubbed twice after use of the OC spray.  Also she stated that the literature on OC spray indicates that it is an inflammatory agent when the spray agent or aerosol comes in contact with skin or mucous membranes of the eyes, nose, throat and lungs and that the length of effects is typically 30 to 45 minutes, with mitigated effects that may last for hours. Ward advised Tamminga that in light of the facts that plaintiff had not come into direct contact with the OC spray, lacked symptoms upon examination and his cell had been cleaned more than once, it was her view that plaintiff's complaints of medical symptoms were unrelated to the prior discharge of OC spray.  Defendant Tamminga recommended dismissal of plaintiff's complaint based on the information defendant Ward and Sgt. Delong gave him.  Defendant Thorpe approved the dismissal of plaintiff's complaint on January 30, 2006.  Her decision was based on the summary of facts provided by defendant Tamminga and her consideration of protocol for health services, which requires nurses to do a health assessment and examination of an inmate who has medical complaints related to exposure

12

to chemical agents.

Defendant Sitzman's duties as a nursing supervisor include reviewing inmate complaints regarding health care services, determining whether the complaints are valid and whether actions need to be taken to address the complaints. Sitzman had no personal contact with plaintiff while he was housed at the Columbia Correctional Institution. She assigned review of plaintiff's inmate complaint CCI-2006-1846 to defendant Ward and instructed Ward to determine whether plaintiff's medical complaints were valid and what medical treatment might already have been provided to him. A copy of the conclusions Ward reported to defendant Tamminga were provided to defendant Sitzman and defendant Grams.

On February 6, 2006, plaintiff sent Grams another letter complaining about a number of things, including the chemical residue in his cell. Grams responded on February 7, 2006, with a memo advising plaintiff that it was appropriate for him to have raised his complaints by utilizing the inmate complaint review system and that if he was dissatisfied with the responses he had received to those complaints, his proper course was to appeal the decisions to the corrections complaint examiner.

Between January 11, 2006 and February 23, 2006, defendant Hahnisch spoke with plaintiff at his cell regarding his medical concerns while she was performing segregation unit rounds. On at least one occasion, plaintiff complained that he was bothered by the smell of

13

OC spray in his cell.  In response to plaintiff's complaint, Hahnisch went to the unit control bubble and asked the sergeant on duty whether the cell had been cleaned.  Hahnisch was told that the cell had been washed down twice and that the residue stained the walls.  At this time, Hahnisch believed plaintiff's cell was sanitary and presented no danger to him.  At all times during plaintiff's incarceration at the Columbia Correctional Institution, defendant Hahnisch addressed plaintiff's medical needs in reliance on her knowledge, experience and expertise as a licensed Registered Nurse.

Plaintiff received an inhaler from defendant Dr. Suliene on January 19, 2006. Between January 20, 2006 and February 16, 2006, plaintiff saw no other person from the health services unit.  When plaintiff saw defendant Suliene again on February 16, 2006, he informed her that he was allergic to pepper and suggested that it might be the Oleoresin Capsicum residue in this cell that was triggering his asthma.  Plaintiff also told defendant Suliene that he was using the inhaler only when he was having difficulty breathing.  He told her that he becomes short of breath if he exercises or sweeps the floor.  Defendant Suliene observed that at the time, plaintiff was in no distress and that he was breathing comfortably. Her examination revealed that plaintiff had diminished breath sounds consistent with previous history of asthma, but he had no wheezing or any signs of congestion or acute asthma.  Defendant Suliene recommended that plaintiff increase the frequency of his use of his Albuterol inhaler to two puffs four times daily, to determine whether his complaints

14

would continue with regular inhaler use.  Following the February 16 examination, defendant Suliene received no requests from plaintiff to be seen by her and no other complaints from him.

At no time has defendant Frank had any personal contact or involvement with plaintiff regarding cell placement.


OPINION

At the pleading stage, a court must accept all the allegations in the complaint as true, without requiring the plaintiff to back up his allegations with evidence.  At summary judgment, however, the standard changes significantly.  The purpose of summary judgment is to determine whether the parties have adduced enough evidence to support a jury verdict in their favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Albiero v. City of Kankakee, 246 F.3d 927, 932 (7th Cir. 2001).

In a civil suit, the plaintiff has the burden to prove his claim.  It is not defendants' burden to disprove it.  Therefore, it is plaintiff who must show what evidence he has that would convince a trier of fact to accept his version of the events.  Schacht v. Wisconsin Dept. of Corrections, 175 F.3d 497, 504 (7th Cir. 1999).  All evidence and inferences are to be viewed in the light most favorable to the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.  However, if the plaintiff fails to make a sufficient showing on

15

an essential element of his case with respect to which he has the burden of proof, summary judgment must be granted to the defendant.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

The Eighth Amendment's prohibition against cruel and unusual punishment imposes upon prison officials the duty to provide prisoners "humane conditions of confinement." Farmer v. Brennan, 511 U.S. 825, 832 (1994).  The conditions must not involve "the wanton and unnecessary infliction of pain."  Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  However, "it is obduracy and wantonness, not inadvertence or error in good faith," that characterize the conduct prohibited by the cruel and unusual punishments clause. Whitley v. Albers, 475 U.S. 312, 319 (1986).  Therefore, to demonstrate that prison conditions violate the Eighth Amendment, plaintiff must prove facts that satisfy a test involving both an objective and subjective component.  Lunsford v. Bennett, 17 F.3d 1574, 1579 (7th Cir. 1994).  The objective analysis focuses on whether prison conditions were sufficiently serious so that "a prison official's act or omission results in the denial of the minimal civilized measure of life's necessities," Farmer, 511 U.S. at 834, or "exceed contemporary bounds of decency of a mature, civilized society."  Lunsford, 17 F.3d at 1579. If the plaintiff establishes successfully that the conditions were sufficiently serious, the subjective component requires proof that the defendants acted with deliberate indifference to a risk of serious harm to plaintiff.  Id.  "Deliberate indifference" means that the defendant

16

knew that the plaintiff faced a substantial risk of serious harm and yet disregarded that risk by failing to take reasonable measures to address it.  <u>Farmer</u>, 511 U.S. at 847.  Thus, it is not enough for plaintiff to prove that a defendant acted negligently or should have known of the risk.  <u>Pierson v. Hartley</u>, 391 F.3d 898 (7th Cir. 2004).  He must show that the official received information from which an inference could be drawn that a substantial risk existed and that the official actually drew the inference.  <u>Id</u>. at 902.

In numerous instances, courts examining challenges to prison cell conditions have held that short periods of confinement in unsanitary conditions do not rise to the level of a constitutional violations.  <u>Harris v. Fleming</u>, 839 F.2d 1232, 1235 (7th Cir. 1988) (depriving prisoner of toilet paper, soap, toothpaste and toothbrush while keeping him in filthy, roach-infested cell for a period of several days was not a constitutional violation); <u>Morissette v. Peters</u>, 45 F.3d 1119, 1122-23, n. 6 (7th Cir.1995) (plaintiff's "filthy" cell and inadequate cleaning supplies did not violate Eighth Amendment); <u>Geder v. Godinez</u>, 857 F. Supp. 1334, 1341 (N.D. Ill. 1995) (defective pipes, sinks and toilets, improperly cleaned showers, stained mattresses, accumulated dust and dirt and infestation by roaches and rats did not rise to level of Eighth Amendment violation, alone or in combination); <u>Wilson v. Schomig</u>, 863 F. Supp. 789, 794-95 (N.D. Ill. 1994) (cell containing dirt, dust, roaches, a leaking roof during rainstorms and urine-stained mattress did not violate the Eighth Amendment).

17

However, courts have found also that poor ventilation leading to prolonged exposure to foul odors or unhealthy airborne microorganisms can violate the Eighth Amendment in some circumstances.  See, e.g., Townsend v. Fuchs, 522 F.3d 765 (7th Cir. 2008) (sleeping on moldy and wet mattress could be sufficiently serious to violate Eighth Amendment); Board v. Farnham, 394 F.3d 469, 485-86 (7th Cir. 2005) (poor ventilation and development of mold that resulted in nosebleeds and respiratory problems violates Eighth Amendment); Keenan v. Hall, 83 F.3d 1083, 1090 (9th Cir. 1996) ("air . . . saturated with the fumes of feces, urine and vomit" violates the Eighth Amendment).  With these cases in mind, I will examine first the facts relating to cell #46 and then the facts relating to cell #27.

A.  Cell #46

The facts reveal that between January 9, 2006 and January 11, 2006 for about 30 hours, plaintiff was held in an observation cell (cell #46) that was covered in feces, urine, semen and pubic hair, that plaintiff was naked except for his underwear and possessed nothing other than a rubber mattress.  This undisputed account of this offensive and obviously unsanitary state of plaintiff's cell, coupled with the fact that plaintiff had no cleaning equipment or any means to clean away the filth himself, is sufficient to satisfy the objective component of plaintiff's Eighth Amendment claim with regard to cell #46.  A reasonable jury could conclude that such conditions violate the Eighth Amendment.

18

Therefore, it is necessary to consider whether defendants were deliberately indifferent to plaintiff's complaints about his cell conditions.

As an initial matter, I note that defendants proposed no facts in support of their motion for summary judgment to prove that plaintiff's exposure to human excrement and other bodily fluids did not subject him to a substantial risk of serious harm, and plaintiff put in no evidence to show that it did. However, it is common knowledge that fecal matter can harbor harmful bacteria, viruses or parasites and that serious diseases such as HIV are transmitted through other bodily fluids. I am persuaded that on the present state of the record, plaintiff has satisfied his burden to raise a jury issue on the question whether the conditions in cell #46 exposed him to a serious risk of harm. Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997) (expert testimony on risk of harm not necessary if seriousness of risk would be obvious to lay person).

Plaintiff proposed only one fact relating to defendant Lt. Keller, which was that Keller had him stripped and put in cell #46 wearing nothing more than his underwear. Because this proposed fact was not supported by the evidence plaintiff cited, it was disregarded. Even if plaintiff had cited competent evidence to support the fact, however, the mere placement of an inmate in a cell wearing nothing more than underwear does not implicate the Eighth Amendment. Therefore, summary judgment will be granted to defendant Lt. Keller.

The parties dispute whether defendants Bittleman, Schoenberg and Strupp saw the

19

foul condition of cell #46.  Plaintiff avers that Bittleman entered the cell, walked around it, saw human waste, and then placed plaintiff in the cell.  He says also that he showed Schoenberg his cell and complained about the filth.  Finally, he says that he stopped defendant Strupp as he was walking by the cell and complained about the feces, urine, semen and pubic hair.  All three of these defendants contend that they have no recollection whether the cell was dirty, but that if it was as filthy as plaintiff contends it was, they would have arranged to have it cleaned or considered moving plaintiff to another cell.  Neither plaintiff nor defendants Bittleman, Schoenberg or Strupp proffered corroborative evidence.  Thus, the dispute whether Bittleman, Schoenberg and Strupp were deliberately indifferent to plaintiff's cell condition can be resolved only by assessing their credibility to determine what they saw, and whether they drew any inferences from what they saw that plaintiff was at risk of harm but disregarded the risk.  That job is exclusively the  domain of the jury.

With respect to defendant Johnson, the parties do not dispute that at around 11:00 p.m. on January 9, 2008, plaintiff told defendant Johnson that his cell was filthy and pointed out to Johnson visible human waste.  They do not dispute that Johnson responded to plaintiff by telling him that there were no other cells available on the unit.  Nor do the parties dispute that 26 hours later, on January 11, 2006, at about 1:00 a.m., Johnson moved plaintiff out of cell #46.  However, the record is devoid of evidence concerning what Johnson actually saw and whether he understood that a short-term exposure to the conditions might

20

pose a substantial risk of serious harm to plaintiff that he nevertheless consciously disregarded.  Those questions, too, remain for resolution at trial.

However, defendants Grams and Trattles have proven that they are entitled to judgment as a matter of law.  The only facts concerning defendants Trattles and Grams with respect to the conditions of cell #46 are that these officials were on plaintiff's unit sometime on January 9, 2006, that plaintiff yelled at them as they were leaving the unit and that they looked in the direction of plaintiff's cell.  In addition, the facts show that after plaintiff had been moved out of cell #46, plaintiff sent defendant Grams letters that Grams received on January 17 and 18, 2006, in which plaintiff complained about the condition of his cell.  Grams referred the letters to defendant Salter for investigation.  The fact that Trattles and Grams turned their heads in the direction of plaintiff's cell as they were leaving the DS-1 unit falls far short of a showing that these officials knew that plaintiff faced a risk of serious harm to his health and disregarded that risk.  Moreover, although plaintiff has adduced evidence to show that he wrote defendant Grams two letters describing the condition of his cell, Grams did not receive the letters until after plaintiff had been moved out of cell #46 and, in any event, he took action to assign the matter to defendant Salter for investigation.  A prison official cannot be held personally liable for violating a prisoner's constitutional rights if he fails to take action on a complaint that is lodged after the alleged violation has ended.  George v. Smith, 507 F.3d 605, 609 (7th Cir. 2007).  Thus, not only do the facts

21

show that defendant Grams was not deliberately indifferent to plaintiff's complaints about the condition of cell #46, but even if plaintiff had proven that Grams took no action at all in response to his letters, no jury could find that defendant Grams personally participated in denying plaintiff his constitutional rights with respect to the condition of cell #46. Therefore, I will grant defendants' motion for summary judgment with respect to plaintiff's claim that defendants Grams and Trattles violated his Eighth Amendment rights with regarding the conditions of Cell #46.

## B.  Cell #27

Although plaintiff's placement in cell #46 raises triable issues, his claims about the conditions of Cell #27 and defendants' response to his complaints does not.  As noted earlier, an inmate alleging that the conditions of his confinement fall below the standard imposed by the Eighth Amendment must prove two things: 1) that from an objective standpoint, the conditions about which he complains are sufficiently serious to allow an inference to be drawn that they deprived plaintiff of the minimal civilized measure of life's necessities or exceeded contemporary bounds of decency of a mature, civilized society; and 2) defendants knew of and acted with deliberate indifference to the risk of harm presented by such conditions.  Plaintiff has failed to carry his burden with respect to the first element.

22

In this case, the undisputed fact is that an inmate janitor cleaned cell #27 after prison officials used pepper spray to extract inmate Manuel Williams from it. The only indication in the record that there was anything unusual about the physical appearance of plaintiff's cell is derived from plaintiff's January 18 letter to defendant Salter, where plaintiff said that when he got to his cell, "there was a large amount of 'orangish looking' liquid on the back wall, some of which had dripped down to the floor and corner by [plaintiff's] bed." However, plaintiff also said that he had "cleaned most but [was] unable to remove a fairly large amount from the crevice between floor and wall and on back wall." Plaintiff put in no expert testimony to show that the discoloration produced by OC spray when it hits a wall or works its way into a crevice has any potency whatsoever. Nor has he put in evidence suggesting that after a cell has been washed down (albeit without a power hose), OC spray residue presents a health risk that is "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past," so that it might be possible to infer that the prison officials responsible for subjecting him to such conditions knew they were subjecting him to a serious risk of harm. Farmer, 511 U.S. at 842. Indeed, other than plaintiff's unsupported speculation that his physical ailments were related to the OC residue, the record is silent on the question whether defendants Salter, Grams, Tamminga, Thorpe, Sitzman or Frank would have any reason to believe that the residue from OC spray poses a substantial risk of serious harm, so that their disregard of it could be considered deliberate indifference. Thus,

23

it is impossible to conclude from the facts in this case that the conditions in cell #27 were objectively serious. Therefore, defendants Salter, Grams, Tamminga, Thorpe, Sitzman and Frank are entitled to summary judgment on this claim.

However, there is a third claim that remains relating to plaintiff's complaints about his health. Plaintiff has supplied factual evidence that during the time he was confined to cell #27, he suffered difficulty breathing (presumably minor asthma attacks), severe chest pain, dry, burning skin, headaches, and watery eyes. He contends that he complained to defendants Muchow, Ward, Hahnisch and Suliene about these conditions and that they were deliberately indifferent to his need for medical attention.

Under the Eighth Amendment, a prison official may violate a prisoner's right to medical care if the official is "deliberately indifferent" to a "serious medical need." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. Johnson v. Snyder, 444 F.3d 579, 584-85 (7th Cir. 2006). The condition does not have to be life threatening. Id. A medical need may be serious if it "significantly affects an individual's daily activities," Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir.1998), if it causes pain, Cooper v. Casey, 97 F.3d 914, 916-17 (7th Cir. 1996), or if it otherwise subjects the prisoner to a substantial risk of serious harm, Farmer v. Brennan, 511 U.S. at 837. Also, in this context "deliberate indifference" means that the

24

officials were aware that the prisoner needed medical treatment, but disregarded the risk by failing to take reasonable measures.  Forbes v. Edgar, 112 F.3d 262, 266 (7th Cir. 1997).

To survive defendants' motion for summary judgment on this claim, plaintiff was required to show 1) that he had a serious medical need; 2) defendants knew he had a serious medical need; and 3) despite their awareness of the need, defendants failed to take reasonable measures to provide the necessary treatment.  From the undisputed facts in this case, I conclude that none of the defendants were deliberately indifferent to plaintiff's need for medical attention.

Defendants argue that summary judgment should be granted to these defendants at the outset because none of the symptoms about which plaintiff complains constitute a serious medical need.  However, defendants concede that plaintiff had been diagnosed with asthma and that asthma can be considered a serious medical condition.  In addition, although it is true that prison officials do not violate the Eighth Amendment when they delay treatment for "the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue," Cooper v. Casey, 97 F.3d at 916, the facts in this case are that plaintiff suffered severe chest pain, dry, burning skin, headaches, and watery eyes.  Drawing all inferences in plaintiff's favor, a reasonable jury could conclude that, with the possible exception of watery eyes, a failure to treat the remaining conditions could result in the infliction of needless suffering in violation of the Eighth Amendment.  Williams v. Liefer,

25

491 F.3d 710, 715 (7th Cir. 2007) (quoting <u>Gil v. Reed</u>, 381 F.3d 649, 662 (7th Cir. 2004) (delay or absence of treatment can constitute harm under Eighth Amendment if it causes "needless suffering."). Therefore, for the purpose of deciding defendants' motion only, I will assume that plaintiff had a serious medical need.

With respect to defendant Muchow, the facts reveal that on January 19, 2006 at around 1:00 p.m., Muchow responded to a health service request from plaintiff in which plaintiff reported headaches, difficulty breathing and chest tightness and pain. At the time of the examination, he denied shortness of breath. Muchow listened to plaintiff's breathing, took his oxygen levels and temperature and concluded that there was nothing abnormal about his physical condition. Nevertheless, she scheduled plaintiff for an appointment with a doctor so that plaintiff could discuss his reported asthma symptoms with her. Muchow also took measures to learn whether there might be any validity to plaintiff's concern that the orange residue on his cell wall and in the crevice at the base of the wall was affecting his ability to breath. After discussing the matter with security staff, Muchow determined from information she had obtained that plaintiff had not been on the tier when the chemical agent was used and that because the cell had been ventilated and cleaned, it was sanitary and presented no danger to plaintiff. No reasonable jury could conclude from these facts that defendant Muchow was deliberately indifferent to plaintiff's medical needs.

With respect to defendant Ward, the facts show that when plaintiff reported having

26

what he believed to be a minor asthma attack later in the day on January 19, 2006, defendant Ward responded to a call from Sgt. Fink and observed plaintiff to have no shortness of breath, no wheezing and no difficulty breathing.  In addition, she followed up on plaintiff's suggestion that it might be the residue on his walls that was causing him to experience asthma symptoms by satisfying herself that the cell had been scrubbed and ventilated and by talking to plaintiff's unit sergeant, who told Ward that plaintiff had not complained of respiratory problems, eye problems or nasal bleeding.  In addition, Ward reviewed the literature on OC spray in an attempt to learn for herself whether it could have "lingering effects."   Later, she reported to defendant Tamminga that the results of her findings were that the effects of OC spray become less harsh over time.   No jury could reasonably find that defendant Ward was deliberately indifferent to plaintiff's need for medical care.

   With respect to defendant Hahnisch, the facts show only that sometime between January 11, 2006 and February 23, 2006, defendant Hahnisch spoke with plaintiff at his cell on at least one occasion, when plaintiff complained that he was bothered by the smell of OC spray in his cell.  There are no facts suggesting that plaintiff told Hahnisch that he was suffering any asthma symptoms or pain at the time or that she observed him in pain or suffering shortness of breath.  Nevertheless, in response to plaintiff's complaint, Hahnisch went to the unit control bubble and asked the sergeant on duty whether the cell had been

27

cleaned, at which time she was told that the cell had been washed down twice and that the residue was simply a stain on the wall.  In light of this information, Hahnisch determined that plaintiff's cell was sanitary and presented no danger to him.  No reasonable jury could conclude from these facts that defendant Hahnisch was deliberately indifferent to plaintiff's serious medical needs.

Finally, the facts reveal that plaintiff saw defendant Dr. Suliene only twice, once on January 19, 2006 when she prescribed an inhaler for him and a second time on February 16, 2006.  Plaintiff has proposed no facts to show that he discussed anything other than his asthma symptoms with defendant Suliene on these occasions and he concedes that she recommended that plaintiff increase the frequency of his use of his Albuterol inhaler to two puffs four times daily, when plaintiff admitted to her that he was using the inhaler only when he was having difficulty breathing, which he told her occurred when he exercised or swept the floor.  He does not dispute that at the February 16 meeting, Suliene observed that plaintiff was in no distress and that he was breathing comfortably, and that although he had diminished breath sounds consistent with a previous history of asthma, he had no wheezing or any signs of congestion of acute asthma.  In other words, plaintiff concedes that defendant Suliene did not ignore his symptoms of asthma.  Rather, he argues that Suliene's decision to treat his symptoms with no more than a directive to increase the use of his inhaler was "blatantly inappropriate" where she could just as easily have ordered "as a course of

28

treatment" that his cell be thoroughly cleaned or that he be moved out of the cell.  Plt.'s Br. at 43-45.  But the law is clear that mere differences of opinion regarding a patient's appropriate treatment is not enough to show deliberate indifference.  Snipes v. Detella, 95 F.3d 586, 591 (7th Cir. 1996) (decision "whether one course of treatment is preferable to another" is beyond the [Eighth] Amendment's purview"); Cole v. Fromm, 94 F.3d 254, 261-62 (7th Cir. 1996).  Therefore, defendant Suliene is entitled to summary judgment in her favor on plaintiff's claim that she denied him his Eighth Amendment rights by failing to treat him in the manner he preferred on January 19 and February 16, 2006.

## C.  Qualified Immunity

Defendants argue that they are entitled to qualified immunity because the law was not clear during the relevant period of time that someone in defendants' positions "would violate [plaintiff's] constitutional rights when they placed him in cells with conditions that did not rise to the level of an Eighth Amendment violation. . . ."  Def. Br. at 43.  This argument is a bit confusing.  Ordinarily, a defendant invokes a qualified immunity defense when the facts suggest that a constitutional violation *has* occurred.  In that circumstance, qualified immunity would shield individual defendants from suit under § 1983 on the theory that they lacked "fair warning" that they were violating the law as it existed at the time of the events giving rise to the lawsuit. Hope v. Pelzer, 536 U.S. 730, 739 (2002); Alexander

29

v. City of Milwaukee, 474 F.3d 437, 443 (7th Cir. 2007).  In other words, the qualified

immunity inquiry is whether a defendant made a decision "that, even if constitutionally

deficient, reasonably misapprehends the law governing the circumstances she confronted."

Brosseau v. Haugen,  543 U.S. 194, 198 (2004).

Here, it is not necessary to examine whether defendants are entitled to qualified

immunity with respect to plaintiff's claims that the conditions of cell #27 and the level of

care he received for his medical complaints violated the Eighth Amendment.  I have found

they did not.  The only claim on which plaintiff may be able to prove a violation of his

Eighth Amendment rights is his claim relating to the conditions in cell #48.  However,

because the questions of what defendants saw and whether they inferred from what they saw

that plaintiff was at risk of serious physical harm are ones that remain for the jury to decide.

The qualified immunity determination necessarily cannot be made until those facts are

sorted out.  The reason for this is explained by the court of appeals in Walker v. Benjamin,

293 F.3d at 1030, 1037 (7th Cir. 2002)(citations omitted):

> Under certain circumstances, such as those presented here, the two inquiries [with
> respect to the merits and qualified immunity]  effectively collapse into one. . . .[A]
> plaintiff claiming an Eighth Amendment violation must show the defendant's actual
> knowledge of the threat to the plaintiff's health or safety, the defendant's failure to
> take reasonable measures, and the defendant's subjective intent to harm or deliberate
> indifference.  If there are genuine issues of fact concerning those elements, a
> defendant may not avoid trial on the grounds of qualified immunity.

Because that there are genuine issues of material fact whether defendants Travis Bittleman,

Thomas Schoenberg, Todd Strupp and Mark Johnson were deliberately indifferent to a serious risk of harm to plaintiff stemming from the conditions in cell #46, I must deny defendants' request for a finding that they are entitled to qualified immunity on this claim without prejudice to their raising the defense again at the close of trial if the circumstances warrant it.

ORDER

IT IS ORDERED that

1. Plaintiff's claim that defendants Janel Nickel, Capt. S. Salter and Travis Bittelman transferred him to the Waupun Correctional Institution on February 23, 2006, in retaliation for his exercise of his First Amendment rights is DISMISSED without prejudice for plaintiff's failure to exhaust his administrative remedies on this claim.

2. Plaintiff's "Motion to Supplement Affidavits One and Two of Plaintiff's Opposition Materials" to permit him to attest to the authenticity of exhibits attached to his affidavits, dkt. #82, and "Motion to Disregard Defendants' Response to Plaintiff's Proposed Findings of Fact", dkt. #88, are DENIED as unnecessary.

3. Defendants' motion for summary judgment is DENIED with respect to plaintiff's claim that defendants Travis Bittleman, Thomas Schoenberg, Todd Strupp and Mark

Johnson were deliberately indifferent to a serious risk of harm to plaintiff stemming from the conditions in cell #46.

4.   Defendants' motion for summary judgment is GRANTED with respect to plaintiff's claim that defendants Lt. Keller, Capt. Trattles and Greg Grams were deliberately indifferent to the conditions in cell #46.

5.   Defendants' motion for summary judgment is GRANTED with respect to plaintiff's claim that defendants S. Salter, Greg Grams, Burt Tamminga, Cynthia Thorpe, Sandra Sitzman and Matthew Frank were deliberately indifferent to the conditions in cell #27.

6.   Defendants' motion for summary judgment is GRANTED with respect to plaintiff's claim that defendants Nancy Hahnisch, Suzanne Ward, Lindy Muchow and Dalia Suliene were deliberately indifferent to plaintiff's serious medical needs.

7.   Defendants Grams, Nickel, Salter, Trattles, Keller, Frank, Tamminga, Sitzman, Strupp, Hahnisch, Ward, Muchow, Thorpe and Suliene are DISMISSED from this case.

Entered this 15th day of September, 2008.

BY THE COURT:

/s/

_____
BARBARA B. CRABB
District Judge